# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

GARY PISCOTTANO, et al.,      :
                                          :

                      Plaintiffs,     :     NO.    3:04cv682 (MRK)
                                            :

v.                                       :

                                            :

BRIAN MURPHY, DEPUTY        :
COMMISSIONER, DEPARTMENT OF   :
CORRECTION, et al.,          :

                                            :

                    Defendants.    :

## MEMORANDUM OF DECISION

Several corrections officers employed by the State of Connecticut's Department of Correction ("DOC") bring this action under 42 U.S.C. § 1983 and § 1988, claiming that the Defendants – the Commissioner, the Deputy Commissioner and three Wardens of DOC – disciplined the officers for associating with a motorcycle group known as the Outlaws Motorcycle Club ("Outlaws") in violation of the officers' constitutional rights under the First Amendment and the Fourteenth Amendment. Currently pending before the Court are the parties' cross-motions for summary judgment [docs. #59 & 69]. Having considered the superb briefs and oral arguments of the parties,[1] for which the Court commends counsel on both sides, the Court concludes that

---

[1] *See* Defendants' Memorandum of Law Supporting Defendants' Motion for Summary Judgment [doc. #60] ("Defs.' Mem."); Defendants' Local Rule 56(a)(1) Statement of Material Facts Not in Dispute [doc. #61] ("Defs.' 56(a)(1) Stmt."); Defendants' Appendix of Documents Supporting Summary Judgment [doc. #64] ("Defs.' Appex."); Plaintiffs' Local Rule 56(a)(2) Statement [doc. #66] ("Pls.' 56(a)(2) Stmt."); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross Motion for Summary Judgment [doc. #68] ("Pls.' Mem."); Plaintiffs' Local Rule 56(a)(1) Statement [doc. #70] ("Pls.' 56(a)(1) Stmt."); Plaintiffs' Appendix [doc. #72] ("Pls.' Appex."); Defendants' Reply Brief Supporting Defendants' Motion for Summary Judgment and Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment [doc. #78-79] ("Defs.' Reply"); and Defendants' Local Rule 56(a)(2) Response to Plaintiffs' Statement of Material Facts Not in

Defendants did not violate Plaintiffs' constitutional rights under either the First or Fourteenth Amendments. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment [**doc. #59**] and DENIES Plaintiffs' Cross Motion for Summary Judgment [**doc. #69**].

## I.

The standards for assessing a summary judgment motion are familiar. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court must draw all ambiguities and inferences in favor of the plaintiffs. *See Andersen*, 477 U.S. at 255. When, as here, a court considers cross-motions for summary judgment, the court applies the same legal principles and "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004) (citations omitted).

---

Dispute [doc. #80] ("Defs.' 56(a)(2) Stmt.").

The basic facts of this case are undisputed and were set forth in some detail in this Court's ruling on Plaintiffs' Motion for a Preliminary Injunction. *See Piscottano v. Murphy*, 317 F. Supp. 2d 97, 99-102 (D. Conn. 2004). Familiarity with the Court's preliminary injunction decision is assumed, and therefore, the Court will not repeat here the facts that are detailed in that decision. Instead, the Court will provide any additional facts relevant to each disputed issue in the sections that follow.[2]

## II.    Expressive Association

As explained in greater detail in the Court's preliminary injunction decision, it is well established that "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *City of San Diego v. Roe*, 125 S. Ct. 521, 523 (2004); *see Piscottano*, 317 F. Supp. 2d at 105-06. On the other hand, it is equally well settled that "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Roe*, 125 S. Ct. at 523. "To reconcile the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission," the Supreme Court has developed a multi-step analysis. *Id*. First, the government employee must demonstrate that his speech "touch[ed] on a matter of public concern." *Id*. at 525 (internal quotations and citations omitted). In *Connick v. Meyers*, 461 U.S. 138 (1983), the Supreme Court explained that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Id*. at 147.

---

[2]  Plaintiff Sabettini withdrew from this lawsuit following the Court's preliminary injunction ruling, leaving Plaintiffs Piscottano, Kight, Scappini and Vincenzo. *See* Amended Complaint [doc. #36].

Second, if the employee satisfies the "public concern" prong, a court must then engage in what has become known as "*Pickering* balancing."  To that end, the court must weigh the "interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

The Second Circuit has made it clear that although *Pickering* and *Connick* involved freedom of speech claims, those decisions also provide the proper framework for assessing freedom of association claims.  *Melzer v. Bd. of Educ.*, 336 F.3d 185, 194-95 (2d Cir. 2002).  In particular, the Second Circuit has stated that the threshold public concern requirement of *Pickering* and *Connick* applies equally to expressive associational claims such as those presented by Plaintiffs in this case.  *See Cobb v. Pozzi*, 363 F.3d 89, 102-03 (2d Cir. 2004); *see also Piscottano*, 317 F. Supp. 2d at 105-06.

Plaintiffs' counsel conceded at oral argument that if Plaintiffs are required to satisfy the public concern requirement, their First Amendment claim must fail, because Plaintiffs acknowledge that on the basis of the undisputed facts they cannot demonstrate that their association with the Outlaws is a matter of public concern.  This is the same conclusion that the Court reached in its preliminary injunction ruling, and nothing in the record on summary judgment has persuaded the Court otherwise.  *See Piscottano*, 317 F. Supp. 2d at 105-08.  Therefore, it is agreed among the parties and the Court that Plaintiffs cannot satisfy the threshold  public concern requirement of the two-step *Connick/Pickering* analysis.

Nevertheless, Plaintiffs argue that their failure to meet to the public concern requirement is not fatal to their expressive association claim for two reasons.  Plaintiffs argue initially that this

Court is not bound to follow the Second Circuit's decision in *Cobb*, *supra*, because the portion of that decision which applied the public concern requirement to expressive association claims was dicta and was wrongly decided.  Alternatively, Plaintiffs argue that in *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454 (1995), and *City of San Diego v. Roe*, *supra*, the Supreme Court held that when an employee's expression occurs during "off-duty" time and does not relate to his or her employment, the expression is not subject to the public concern standard.  *See* Pls.' Mem. at 6-7.   Plaintiffs assert that their association with the Outlaws falls within this so-called "off duty" category of expression, and therefore, they are relieved of the burden of satisfying the public concern requirement of *Pickering* and *Connick*.  The Court disagrees with each of Plaintiffs' arguments.

First, the Court is not persuaded that it may ignore the Second Circuit's holding in *Cobb*. Judge Meskill's opinion for the court in *Cobb* squarely addressed the issue of whether the public concern test applies to expressive association claims.  The opinion in *Cobb* explicitly noted that other circuits had divided on that issue and expressly sought to provide guidance to lower courts regarding the Second Circuit's resolution of that dispute:  "We . . . join[] [with] the Fourth, Sixth, and Seventh circuits, [and] hold that a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern."  *Cobb*, 363 F.3d at 102.  Nothing could be plainer or more explicit.

It is true that after concluding that the public concern test applies to freedom of association claims, the Second Circuit then declined to decide whether the plaintiffs' union membership in that case touched on a matter of public concern.  *See id.* at 107.   Instead, the Second Circuit assumed that the public concern test had been satisfied and resolved the appeal on

the basis of the causal connection element of the plaintiffs' retaliation claim.  *See id.*  Strictly speaking, therefore, the public concern discussion in *Cobb* is dicta because it was not necessary to the Court's resolution of the appeal.  *See Cotto v. Herbert*, 331 F.3d 217, 250 n.20 (2d Cir. 2003) ("We have . . . describe[d] our prior statements as dicta when they were not necessary to the holdings of the decisions in which they were made.").

Nevertheless, as the Second Circuit has recognized, there is dicta and then there is dicta. Specifically, the Second Circuit has distinguished between "obiter dictum" and "judicial dictum" stating that "[w]hile . . . [judicial] dictum is not binding . . .  it must be given considerable weight and can not be ignored in the resolution of the . . . question [a court must] decide."  *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975).  *See also Velazquez v. Legal Services Corp.*,  349 F. Supp. 2d 566, 600 (E.D.N.Y. 2004) ("Since this dicta was obviously designed to guide the district court . . . the Court considers it "judicial dictum," rather than "obiter dictum," which it will follow.") (internal citations omitted).  A recent and well known example of this distinction between categories of dicta is found in the Second Circuit's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Though *Crosby* contains many statements of law that were not, strictly speaking, necessary to resolution of the particular case before the court, the panel made it clear in its decision that it intended to provide Circuit guidance to lower courts on the "larger framework" of the role of the United States Sentencing Guidelines after the Supreme Court's landmark decision in *United States v. Booker*, 125 S. Ct. 738 (2005).  *See Crosby*, 397 F.3d at 106-07.  In those circumstances, it is difficult to imagine a district court within this Circuit choosing to ignore any of *Crosby*'s pronouncements on the ground that they were unnecessary to resolution of the case and therefore dicta.  So too here, unless and until the Second Circuit

-6-

indicates otherwise, this Court considers itself bound by the Second Circuit's public concern holding in *Cobb*.

Even if the Court were not bound by *Cobb*, the Court would nonetheless apply the public concern requirement to Plaintiffs' expressive association claim.  As Judge Meskill's decision emphasized, the Supreme Court's decisions protecting employee speech that touches on matters of public concern are predicated on the concept that "such speech constitute[s] the 'essence of self-government.' "  *Cobb*, 363 F.3d. at 104 (citing *Pickering*, 391 U.S. at 145-46).  As the Supreme Court emphasized, "*speech on public issues* occupies the highest rung on the hierarchy of First Amendment values," *Connick*, 461 U.S. at 145 (emphasis added), and as such, it deserves a greater degree of protection than speech that does not bear on issues of public concern.  *See also Roe*, 125 S. Ct. at 525 ("To require *Pickering* balancing in every case where speech by a public employee is at issue, no matter the content of the speech, could compromise the proper functioning of government offices.").  As *Cobb* rightly points out, given the fact that "the right of association is derivative of the First Amendment rights of free speech and peaceful assembly, it would be anomalous to exempt it from *Connick*'s public concern requirement and thereby accord it an elevated status among First Amendment freedoms." *Cobb*, 363 F.3d at 105.  Thus, even if the Court were free to ignore *Cobb*, the Court would follow its thorough and well-reasoned decision to apply the public concern test to expressive association claims such as that presented by Plaintiffs in this case.[3]

---

[3] Parenthetically, the Court notes that in arguing against application the public concern test to expressive association claims, Plaintiffs rely heavily upon language from a Seventh Circuit decision in *Balton v. City of Milwaukee*, 133 F.3d 1036 (7th Cir. 1998).  In *Balton*, a panel of the Seventh Circuit expressed some concern that, "because *Connick*'s public concern test grew out of a speech case, it may not appropriately recognize the important distinction between speech and

Second, the Court also disagrees with Plaintiffs that the Supreme Court's decisions in *NTEU* and *Roe* recognized a new category of protected employee speech that is not subject to the public concern requirement.

Plaintiffs' argument is predicated almost entirely upon one paragraph in the Supreme Court's brief, *per curiam* decision in *Roe*. There, the Supreme Court held that the San Diego Police Department did not violate a police officer's First Amendment rights when it fired him for making pornographic videos showing the officer stripping off his police uniform, even though the officer's activity occurred while he was off-duty. Before analyzing *Roe's* claim under the *Connick/Pickering* rubric, the Supreme Court made this statement:

> The Court has recognized the right of employees to speak on matters of public concern. . . . Outside of this category, the Court has held that when government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some justification "far stronger than mere speculation" in regulating it.

*Roe*, 125 S. Ct. at 523-24 (quoting *NTEU*, 513 U.S. at 465). The Court went on to conclude that because the speech at issue was "detrimental to the [San Diego Police Department] . . . the present case [fell] outside the protection afforded in *NTEU*. The authorities that instead control . . . are this Court's decisions in *Pickering*, *supra*, *Connick*, *supra*, and the decisions which follow them." *Roe*, 125 S. Ct. at 524. Plaintiffs argue that above-quoted language shows that the Supreme Court recognizes a category of employee expression – speech that is "on their own time

---

association" potentially leading to "insufficient protection of the associational rights of public employees." *Id.* at 1040. However, despite this statement, the panel in *Balton* adhered to existing Seventh Circuit precedent that applied the public concern test to association claims. Moreover, subsequent to *Balton*, the Seventh Circuit reaffirmed that precedent. *See Klug v. Chicago Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999). Therefore, even the Seventh Circuit has rejected the rule Plaintiffs advocate in this Court.

on topics unrelated to their employment" – which is properly analyzed under *NTEU* and not under the public concern standard of *Connick/Pickering*.

The Court disagrees. Contrary to Plaintiffs' argument, *NTEU* and *Roe* both confirm that the public concern requirement of *Connick/Pickering* applies to Plaintiffs' First Amendment claim. To begin with, neither this Court nor the parties have identified any decision in which a court has afforded First Amendment protection to public employee speech that did not touch on a matter of public concern. *NTEU* is no exception. Although, as the Supreme Court noted, *NTEU* was unusual in that it involved "speech whose content had nothing to do with the workplace," the Supreme Court did not suggest that this distinction rendered the *Connick/Pickering* test inapplicable in *NTEU*. *Id*. at 466 (citing *Rankin v. McPherson*, 483 U.S. 386-87, 392 (1987)). To the contrary, the Supreme Court faithfully applied the *Connick/Pickering* analysis, finding first that "Respondents' expressive activities . . . [fell] within the protected category of citizen comments on matters of public concern." *NTEU*, 513 U.S. at 466; *see also id.* at 465 ("they write and speak for segments of the general public"); *id.* at 470 (the Government's restriction "also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said . . . we cannot ignore the risk that it might deprive us of the work of a future Melville or Hawthorne"). Then, and only then, did the Supreme Court proceed to balance the Government's interests against the severity of the restriction and the interests of the employees.

To be sure, in the balancing portion of its analysis in *NTEU*, the Supreme Court explicitly distinguished the case before it from "*Pickering* and its progeny," noting that the restriction at issue in *NTEU* constituted a "wholesale deterrent to a broad category of expression by a massive

number of speakers" rather than a "*post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities." *Id.* at 467.  As a result, the Supreme Court recognized that it might have to adjust the manner in which the "components of the *Pickering* balance should be analyzed in the context of a sweeping statutory impediment to speech." *Id.*  The Supreme Court also noted that the employee speech at issue "involved content largely unrelated to their government employment" and that as a result, the Government was "unable to justify [its regulation] on the grounds of immediate workplace disruption asserted in *Pickering* and the cases that followed it." *Id.* at 466, 470.  These factors together led the Supreme Court in *NTEU* to require "a much stronger justification" than ordinarily needed to shift the *Pickering* balance towards the Government.  However, the Supreme Court in *NTEU* never suggested that the above-noted factors relieved the plaintiffs in that case from the need to satisfy the public concern requirement of *Connick/Pickering*.

Accordingly, when in *Roe* the Supreme Court distinguished the case before it from *NTEU*, the Court was simply acknowledging that unlike the speech in *NTEU*, *Roe*'s speech could easily be seen as "harmful to the proper functioning of the police force" and therefore the Government was not required to provide a more compelling justification for its regulation at the *Pickering* balancing stage.  *Roe*, 125 S. Ct. at 524.  Nothing in either *Roe* or *NTEU* suggests that the Supreme Court in those cases had decided to categorically exempt "off-duty" public employee expression from the public concern requirement of *Connick/Pickering*.  *See Shelton Police Union, Inc. v. Voccola*, 125 F. Supp. 2d 604, 622 (D. Conn. 2001) (noting that the Supreme Court applied *Pickering* in *NTEU*); Stacy E. Smith, *Who Owns Academic Freedom?*, 59 Wash. & Lee L. Rev. 299, 334-35 (2002).

-10-

At best, *NTEU* might have made it more difficult for Defendants in this case to prevail on the second, balancing portion of the *Connick/Pickering* analysis.  Yet, the Court need not, and does not, get to the second part of that analysis in this case, because Plaintiffs have rightly conceded that their First Amendment claim founders on the threshold public concern inquiry.  Therefore, the Court grants summary judgment in favor of the Defendants on Plaintiffs' First Amendment expressive association claim.[4]

### III.    Intimate Association

Plaintiffs also assert a claim pursuant to the Fourteenth Amendment freedom of intimate association.  Many features of Plaintiffs' intimate association claim are intertwined with their First Amendment expressive association claim.  Nevertheless, the Court agrees with Defendants that Plaintiffs' intimate association claim should be assessed separately from their expressive association claim.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984) ("We . . . find it useful to consider separately the effect of [defendant's actions on plaintiffs'] freedom of intimate association and their freedom of expressive association.").

---

[4] The Court also notes that even if Plaintiffs had persuaded the Court that the public concern test did not apply to their expressive association claim – either because the Court was not bound by *Cobb* or because their association fell into a distinct "non-work-related" category of expression – Defendants would likely be entitled to qualified immunity on Plaintiffs' claim.  *See Connecticut v. Crotty*, 346 F.3d 84, 101-02 (2d Cir. 2003) ("Qualified immunity is warranted if either (1) the official's actions did not violate clearly established law, or (2) even if the actions violated a clearly established law the official was objectively reasonable in believing in the lawfulness of his actions.").  Whether or not any portion of *Cobb* is dicta, it certainly would have been "objectively reasonable" for Defendants to assume that *Cobb* correctly stated the law of the Second Circuit.  Similarly, given their heavy reliance on the Supreme Court's December 2004 decision in *Roe*, Plaintiffs would be hard-pressed to argue that the existence of an "off-duty" category of protected employee expression was "clearly established" at the time of the actions at issue in this case, which principally occurred in April 2004.

In its intimate association line of cases, the Supreme Court has recognized that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts*, 468 U.S. at 617-18.  However, the Supreme Court has limited intimate association protection to a category of relationships "distinguished by such attributes as smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id*. at 620.  Acknowledging that human relationships take "a broad range" of forms that are difficult to categorize, the Supreme Court has not "attempted to mark the precise boundaries of this type of constitutional protection." *Bd. of Dir. of Rotary Int'l. v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987).  Instead, the Supreme Court has instructed lower courts to undertake "a careful assessment of where [the relationship at issue]'s objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 617.  Factors such as "size, purpose, policies, selectivity, [and] congeniality" may be particularly relevant to that assessment. *Id.*

While the Supreme Court has never restricted intimate association constitutional protection to family relationships alone, courts have rarely found non-family relationships such as clubs and fraternities to support an intimate association claim. *See, e.g.*, *Roberts*, 468 U.S. at 621 (declining to afford protection to the Jaycees); *Duarte*, 481 U.S. at 547 (Rotary Club not entitled to intimate association protection); *Patel v. Searles*, 305 F.3d 130, 136 (2d Cir. 2002) (declining to decide whether the right to intimate association extends to friendships); *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (college fraternity

members not protected by intimate association right).  After considering the relevant, undisputed

features of the Outlaws, the Court concludes that this group falls outside of the category of

intimate relationships that warrant constitutional protection.

Although neither party has specified the precise size of the Outlaws, it is apparent that it is

not a small group.  *See Duarte*, 481 U.S. at 546 (rotary club with chapter membership ranging

from 20 to 400 was not small).  The Outlaws is an international organization with chapters in the

United States, Canada, Europe and Australia.  *See* Defs.' 56(a)(1) Stmt. ¶ 17; Pls.' 56(a)(2) Stmt.

¶ 17.  Within the United States, there are chapters located in many states, including Wisconsin,

Florida, Indiana, North Carolina, Massachusetts, New Hampshire, New York and Connecticut.

*See id*.  Indeed, according to Plaintiff Gary Piscottano, "when an [Outlaws] member dies,

*hundreds* of members attend the funeral and offer support and comfort to the family."  *See*

Piscottano Response to Defs.' Interrogatories and Requests for Production, Defs.' Appex. at 446

(emphasis added).

Nor is the Outlaws a particularly selective organization.  To be sure, membership in the

Outlaws is not open to the general public.  Membership is extended only by invitation and

involves a probationary period.   *See* Pls.' 56(a)(1) Stmt. ¶¶ 32-33.  Nevertheless, nothing in the

record reveals any onerous requirements for membership.  According to Plaintiffs, the group

"embraces" those who chose a "non-mainstream, non-traditional, unconventional lifestyle,

appearance, ideals and/or job."  *Id*.  *See Pi Lamba Phi*, 229 F.3d at 442 (fraternity was not

"particularly selective in whom it admits" because it "recruit[ed] new members aggressively").

It is also undisputed that many of the Outlaws' activities and events – such as motorcycle

rides, cookouts and parties – are freely open to non-members.  *See* Pls.' 56(a)(1) Stmt. ¶ 35.  This

-13-

lack of seclusion from the public also militates against a finding that the Outlaws is the type of intimate association that justifies First Amendment protection. *See Roberts*, 468 U.S. at 621 (finding significant that "numerous non-members . . . regularly participate in a substantial portion" of the Jaycees activities); *Duarte*, 481 U.S. at 457 (noting that "[m]any of the Rotary Clubs' central activities are carried on in the presence of strangers"); *Pi Lamba Phi*, 229 F.3d at 442 (court was influenced by the fact that fraternity "invites members of the public into its house for social activities and participates in many public University events").

In sum, taking the facts in the light most favorable to Plaintiffs, the Court nonetheless concludes on the basis of the undisputed facts in the record that membership in the Outlaws falls outside of the range of intimate associations that are protected by the First Amendment. Therefore, the Court grants summary judgment to Defendants on Plaintiffs' First Amendment intimate association claim.

## IV.    Equal Protection – "Class of One"

In addition to their associational claims, Plaintiffs also allege that Defendants violated their Fourteenth Amendment equal protection rights under the so-called "class of one" theory articulated by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  The Second Circuit has required plaintiffs asserting an *Olech*-type equal protection claim to establish that they: "were treated differently from similarly situated [corrections] officers . . . , and that there was no rational basis for the difference in treatment." *Cobb*, 363 F.3d at 110 (citations and quotations omitted).

Recently, the Second Circuit had occasion to refine and restate a plaintiff's burden under

-14-

*Olech. See Neilson v. D'Angelis*, --- F.3d ---, 2005 WL 1244795, at *4 (2d Cir. May 26, 2005).

In *Neilson*, the Second Circuit overturned a jury verdict for the plaintiff on an *Olech* claim and

ruled that "Neilson did not, as a matter of law, satisfy the similarly situated requirements of an

Equal Protection 'class of one' claim." *Id.* at *1.  The Second Circuit explained that "in order to

succeed on an *Olech* claim, the level of similarity between plaintiffs and the persons with whom

they compare themselves must be extremely high," and much higher than is required for the use of

comparators in Title VII claims.  *Id.* at *4.  Plaintiffs pursuing an *Olech* claim must demonstrate

that they were treated differently than someone who is "*prima facie* identical in all relevant

respects." *Id.* at *4-*5.  The reason for demanding this high standard of similarity in *Olech* claims

is that the "existence of persons in similar circumstances who received more favorable treatment

than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out

for reasons that lack any reasonable nexus with a legitimate governmental policy." *Id.* at *4.

Thus, the court concluded, "[t]he similarity and equal protection inquiries are . . . virtually one

and the same in . . . a 'class of one' case." *Id.* at *5.

Accordingly, the Second Circuit restated the requirements that an *Olech* plaintiff must

establish as follows:

> that (i) no rational person could regard the circumstances of the plaintiff to differ
> from those of a comparator to the degree that would justify the differential
> treatment on the basis of a legitimate government policy; and (ii) the similarity in
> circumstances and difference in treatment are sufficient to exclude the possibility
> that the defendant acted on the basis of a mistake.

*Id*.  On the record before this Court, it is apparent as a matter of law that Plaintiffs cannot satisfy

the first prong of the *Neilson* test.

First, Plaintiffs have not identified any similarly situated corrections officers who were

allegedly treated differently by Defendants.  *See* Pls.' Mem. at 45.  Instead, Plaintiffs merely argue that "Defendants have never before applied Administrative Directive 2.17 to forbid association with any particular club."  *Id*; *see also* Defs.' Appex. at 149 (testimony of union representative John Pepe at preliminary injunction hearing).  This fact alone will not sustain Plaintiffs' burden on summary judgment.  *See 3883 Connecticut LLC v. Dist. of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003) (affirming grant of summary judgment on *Olech* claim where plaintiffs showed only that defendants "had never before required an [Environmental Import Statement] for an apartment building project").

Even if Plaintiffs' reference to unidentified "other club[s]" were sufficient to establish the existence of comparators, on the record before the Court, Plaintiffs could not show that these other clubs are similarly situated to the Outlaws to such a degree that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to the degree that would justify the differential treatment on the basis of a legitimate government policy."  *Neilson*, 2005 WL 1244795, at *5 (standard for similarity is whether plaintiff's circumstances are "*prima facie* identical" to that of his or her comparators' circumstances).  It is undisputed that ensuring the safety of staff and inmates is a legitimate policy of the DOC.  It is also undisputed that the DOC believed the Outlaws to be a criminal enterprise based upon information it had received from federal and state law enforcement agencies, and that this information caused Defendants to be concerned about the security at DOC facilities.  *See* Defs.' 56(a)(1) Stmt. at ¶ 16-17; Pls.' 56(a)(2) Stmt. at ¶ 16-17.  The parties also agree that the DOC had received information from State Trooper Williams, a state police officer who specializes in investigating motorcycle groups, that the Outlaws were "at war" with the Hells Angels and that there had been at least one violent

incident involving a member of the Waterbury Chapter of the Outlaws.  *See* Defs.' 56(a)(1) Stmt. at ¶¶ 21-23; Pls.' 56(a)(2) Stmt. at ¶¶ 21-23.  Officer Williams also testified at the preliminary injunction hearing without contradiction that any state police officer who was known to associate with the Outlaws would be fired immediately.  *See* Defs.' Appex. at 211 (testimony of Officer Williams).

Plaintiffs do not claim, and the record does not show, that the DOC had similar information of criminal activity regarding any other club or association with which its employees associated.  Instead, Plaintiffs baldly allege that "[a] reasonable jury could infer that Defendants had no rational basis for singling out Plaintiffs' association with the Outlaws Motorcycle Club, as they had "no basis upon which to reasonably conclude that such an association would disrupt the workplace."  Pls.' Mem. at 45.  Particularly after the Second Circuit's decision in *Neilson*, it is clear that Plaintiffs' claim cannot succeed as a matter of law.  As discussed above, it is undisputed that Defendants had information about criminal activity by the Outlaws that rightly caused them to be concerned about security at DOC facilities.  On these facts, a reasonable jury would be unable to conclude that no rational person could regard the circumstances of the Outlaws to differ from clubs with no known links to criminal activity "to the degree that would justify the differential treatment on the basis of a legitimate government policy."  *Neilson*, 2005 WL 1244795, at *5; *see Bizzarro v. Miranda*, 394 F.3d 82, 89-90 (2d Cir. 2005) ("*Olech* does not empower federal courts to review government actions for correctness."); *Harlen Assocs. v. Village of Minneola*, 273 F.3d 494, 500 (2d Cir. 2001) (A decision "can be considered irrational" only when the decision-maker "acts with no legitimate reason for its decision.") (quotation marks and citation omitted).  Accordingly, the Court grants summary judgment to Defendants on Plaintiffs' "class of one" equal

protection claim.

## V.   Void for Vagueness

Finally, Plaintiffs also claim that Administrative Directive 2.17 is unconstitutionally vague as it was applied to them in violation of the Fourteenth Amendment.  Directive 2.17 provides in relevant part as follows:

> As an employee of the Department of Corrections you must: . . . Cooperate fully and truthfully in any investigation conducted by the department or other law enforcement or regulatory agency. . . . The department prohibits the following behavior: . . . Engaging in unprofessional or illegal behavior – on or off duty – that could negatively reflect on the department.

Employee Handbook, Defs.' Appex. at 432.

As a preliminary matter, this Court notes that unlike the other claims discussed above, there are two issues of disputed fact relevant to Plaintiffs' void for vagueness claim.  First, with respect to Plaintiffs Piscottano and Kight, there is some dispute regarding the real reason for their terminations.  Defendants maintain, and the termination letters that Messrs. Piscottano and Kight received state, that they were terminated for being "less than truthful" when questioned about their association with the Outlaws during the DOC's investigation.  *See* Termination Letters, Defs.' Appex. at 427-28.  There is certainly no ambiguity in the portion of Directive 2.17 that requires corrections officers to "[c]ooperate fully and truthfully in any investigation conducted by the department or other law enforcement or regulatory agency."  Therefore, if untruthfulness was in fact the principal reason for the firing of Messrs. Piscottano and Kight, it is clear that no vagueness challenge would lie.  Nevertheless, Plaintiffs assert that the true reason for their terminations was not untruthfulness but rather the fact that they associated with the Outlaws.

-18-

Because these issues arise on a motion for summary judgment, the Court must assume that Plaintiffs were in fact terminated because of their association with the Outlaws and not because of untruthfulness.

Second, it is also unclear at this stage whether the formal counseling that Plaintiffs Vincenzo and Scappini received on April 22, 2004, constituted discipline or whether it was simply a warning of possible future discipline. If the formal counseling these Plaintiffs received was simply a warning, then any vagueness challenge brought by them necessarily must fail. For however broad the language of Directive 2.17 may be, the formal counseling letter clearly put these two Plaintiffs on notice that any further association with the Outlaws would violate the regulation and be grounds for termination.[5] *See Perez*, 368 F.3d at 178-79 (regulation prohibiting conduct "detrimental to the best interests of racing" was not unconstitutionally vague where plaintiff was warned that he would be subject to sanction if he continued to curse at a meeting); *Janusitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 27 (2d Cir. 1979) (rejecting vagueness challenge to regulation prohibiting "unbecoming conduct detrimental to the welfare or good name of the Department" where "appellant received specific warning from the Chief before he embarked upon further conduct"). Nonetheless, as noted above, because these matters arise on summary judgment, the Court will assume that Plaintiffs Vincenzo and Scappini were disciplined when they received formal counseling on April 22, 2004, and that they received this

---

[5] In this regard, the Court notes as well that Mr. Vincenzo, who was terminated on November 29, 2004 for violating Directive 2.17, undisputedly received notice prior to his termination that associating with the Outlaws violated DOC regulations. Not only did he receive a formal counseling, he was also unequivocally informed by letter on July 1, 2004 that attending an Outlaws party would violate Directive 2.17. *See* Defs.' 56(a)(1) Stmt. at ¶¶ 43-44; Pls.' 56(a)(2) Stmt. at ¶¶ 43-44. Therefore, Mr. Vincenzo cannot challenge his 2004 termination on the basis of any claim that Directive 2.17 is unconstitutionally vague.

discipline because of their association with the Outlaws.

Even crediting Plaintiffs' version of the facts over Defendants' for purposes of the present motions, Directive 2.17 is not unconstitutionally vague as applied to the Plaintiffs. The Due Process Clause requires that "laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Gen. Media. Communications, Inc. v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). The Second Circuit has "clearly held however, that a statute or regulation is not required to specify every prohibited act." *Perez v. Holbrock*, 368 F.3d 166, 175 (2d Cir. 2004). This leeway is necessary to allow for the drafting of statutes and regulations that are "both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Arnett v. Kennedy*, 416 U.S. 134, 159-60 (1972).[6] Furthermore, "the Supreme Court has expressed 'greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.' " *Perez*, 368 F.3d at 175 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)).

Applying these principles, courts have regularly upheld language as broad as Directive 2.17 against vagueness challenges. *See, e.g., Perez*, 368 U.S. at 176 (upholding prohibition on

---

[6] A more rigorous test applies when a regulation "threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). However, that higher standard is not implicated here because the Court has already determined that Directive 2.17 was not applied in a manner that unconstitutionally restricted Plaintiffs' constitutional rights under the First or Fourteenth Amendments. *See Perez*, 368 U.S. at 175 n.5.

conduct "detrimental to the best interests of racing"); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992) (rejecting professor's vagueness challenge to regulation requiring professors to engage in "sound scholarship and competent teaching"); *Cranston v. City of Richmond*, 710 P.2d 845, 851 (Cal. 1985) (rejecting vagueness challenge to "conduct unbecoming" statute). Furthermore and importantly, Directive 2.17 amply encompasses the conduct with which Plaintiffs, by their own characterization, were charged – that is, associating with a group that Defendants understood to be "a criminal enterprise." Pls.' Mem. at 44. *See Perez*, 368 F.3d at 175 ("our primary focus must be on whether the specific conduct at issue in the case falls with sufficient clarity within the ambit of the regulation").

Nevertheless, Plaintiffs argue that Directive 2.17 is vague as applied to them, because they were not warned that Defendants viewed the Outlaws to be a criminal enterprise, a characterization that Plaintiffs vehemently dispute. *See* Pls.' Mem. at 42-43. Worse yet, Plaintiffs argue, they were informed by one or more of their superiors that it was acceptable for them to associate with the Outlaws, and therefore, Plaintiffs were mislead regarding Defendants' construction of Directive 2.17. *See* Pls.' 56(a)(1) Stmt. at ¶¶ 6-10; Defs.' 56(a)(2) Stmt. at ¶¶ 6-10. In essence, Plaintiffs disagree with the DOC that the Outlaws are associated with criminal conduct and they take issue with the decision to discipline them for conduct that Plaintiffs were told was permitted.

Plaintiffs' assertion that they did not know that the DOC viewed the Outlaws to be a criminal organization is undercut by the undisputed fact that in November 2003 each Plaintiff received a copy of the DOC's report outlining numerous instances of criminal conduct by Outlaws members and officials. *See* Pls.' 56(a)(1) Stmt. at ¶ 16; Report, Defs.' Appex. at 371. Yet, at

least two Plaintiffs – Messrs. Kight and Piscottano – continued to attend Outlaws events even after being placed on administrative leave pending DOC's full investigation of their association with the Outlaws. *See* Defs.' 56(a)(1) Stmt. at ¶ 37; Pls.' 56(a)(2) Stmt. at ¶ 37; Defs.' Appex. at 41. Furthermore, as noted earlier, Mr. Vincenzo also continued to attend the Outlaws' activities even after being told expressly that attending Outlaws events would result in termination. *See* note 5, *supra*.

In any event, accepting Plaintiffs' version of events as true for purposes of this motion, the fact that Plaintiffs may have been misled by some of their supervisors – while certainly disturbing to the Court – does not alter the void for vagueness analysis. The relevant question for purposes of Plaintiffs' constitutional vagueness challenge is whether Directive 2.17 would put a reasonable officer on notice that the conduct with which he is charged violates that regulation. *See United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990) ("[S]ufficiency of notice is to be determined by examining the statute in light of the conduct with which a defendant is charged.") (citations and quotation marks omitted). There can be no serious dispute that a reasonable corrections officer would recognize that a regulation prohibiting him from "[e]ngaging in unprofessional or illegal behavior – on or off duty – that could negatively reflect on the department" would bar him from associating with a group that has been identified, at least at the national level, as having been involved in criminal and gang-related activities. *See Perez*, 368 F.3d at 177 (veteran of horse-racing industry would know that his disruptive conduct constituted conduct "detrimental to the best interests of racing generally"); *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) ("regulations satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the

objectives the regulations are meant to achieve, has fair warning of what the regulations require").

That the DOC did not undertake to specify every group that would raise concerns under the Directive does not render the regulation unconstitutionally vague, as "[i]t would be daunting indeed for [general directives] to set out the specific [groups]" with which association is deemed unprofessional "and to keep that list current." *Inturri v. City of Hartford*, --- F. Supp. 2d --- , 2005 WL 736882, at *12 (D. Conn. Mar. 30, 2005) (rejecting vagueness challenge to regulation that required police officers to cover tattoos "deemed offense and/or presenting an unprofessional appearance").

Nor does Plaintiffs' claim of being misled by their supervisors render an otherwise constitutional regulation void for vagueness.  The Supreme Court made this clear long ago in *Cox v. Louisiana*, 379 U.S. 559 (1965), a case in which a demonstrator was convicted of violating a statute that prohibited demonstrating "near" a courthouse.  In challenging his arrest, the demonstrator argued that the provision was unconstitutionally vague, and in support of his claim, the demonstrator cited the fact that a police officer present on the scene told him that he could lawfully demonstrate on the west side of the street, the location where he and other demonstrators were later arrested.  *Id.* at 569-70.  The Supreme Court rejected the demonstrator's argument that the statute was unconstitutionally vague as applied to his conduct, noting that he and other demonstrators were clearly "near" the courthouse when they were arrested, and thus had engaged in conduct that violated the statute.  *Id*. at 568 (demonstrators were arrested while standing "within the sight and hearing of those in the courthouse").  *See also Grayned*, 408 U.S. at 112 n.17 (citing *Cox*, 379 U.S. at 568-69)); *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344

-23-

F.3d 959, 973 (9th Cir. 2003) (upholding ordinance against vagueness challenge) (citing *Cox*, 379

U.S. at 568).  Here, too, Plaintiffs' association with a group that, at least at the national level, had

been linked to numerous criminal and gang-related activities, fell within the clear proscription of

Directive 2.17.  As a result, the directive does not run afoul of the void for vagueness doctrine.

It is worth noting that while the Supreme Court rejected the void for vagueness challenge

in *Cox*, the Court nevertheless overturned the demonstrator's conviction on the grounds of

estoppel, stating that "the highest police officials of the city" approved his conduct, and that to

sustain the conviction would be to sanction "an indefensible sort of entrapment by the State." *Id*.

at 570-71.  *See also United States v. George*, 386 F.3d 383, 399-401 (2d Cir. 2004) (discussing

characteristics and application of entrapment by estoppel defense).  Although *Cox* arose in the

criminal context, similar concerns for fairness may well be relevant to the employment claims

Plaintiffs are pursuing in their grievance proceedings against the DOC.  However, because

Plaintiffs have not asserted any estoppel claim in this case, the Court has no occasion to consider

such an argument.

Accordingly, the Court grants summary judgment to Defendants on Plaintiffs' Fourteenth

Amendment void for vagueness claim.

## VI.

In conclusion, for the reasons stated above, the Court GRANTS Defendants' Motion for

Summary Judgment [**doc. #59**] and DENIES Plaintiffs' Cross Motion for Summary Judgment

[**doc. #69**].  **The Clerk is directed to enter judgment for Defendants on all of Plaintiffs'**

**claims and close the file.**

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut on: <u>June 9, 2005</u>**.